## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) Chapter 11 |
| | ) |
| Debtors. | ) Case No. 14-10979 (CSS) |
| | ) |
| | ) (Jointly Administered) |
| | ) |
| MARATHON ASSET MANAGEMENT, LP; | ) |
| POLYGON CONVERTIBLE OPPORTUNITY | ) |
| MASTER FUND; and | ) |
| POLYGON DISTRESSED OPPORTUNITIES | ) |
| MASTER FUND | ) |
| | ) |
| Plaintiffs. | ) |
| | ) |
| -against- | ) |
| | ) |
| WILMINGTON TRUST, N.A., as First Lien | ) |
| Collateral Agent and First Lien Administrative | ) |
| Agent; ANGELO GORDON & CO., LP; APOLLO | ) |
| ADVISORS VII, L.P.; BROOKFIELD ASSET | ) |
| MANAGEMENT PRIVATE INSTITUTIONAL | ) |
| CAPITAL ADVISER (CANADA), L.P.; and JOHN | ) |
| DOE #1 through JOHN DOE #10, | ) |
| | ) |
| Defendants. | ) |

Adversary Proceeding

Case No. _____

## COMPLAINT

Plaintiffs Marathon Asset Management, LP, on behalf of one or more managed funds

and/or accounts ("Marathon"), Polygon Convertible Opportunity Master Fund, and Polygon

Distressed Opportunities Master Fund (collectively, "Polygon," and together with Marathon,

"Plaintiffs"), through their undersigned counsel, allege as follows based upon their knowledge,

information, and belief:

## NATURE OF ACTION

1.      Plaintiffs bring this action for declaratory judgment, pursuant to 28 U.S.C. §
2201, to resolve a dispute concerning Plaintiffs' contractual rights pursuant to a $1.25 billion
letter of credit subfacility under which Plaintiffs are lenders.  Defendants are the agent and other
non-letter of credit subfacility lenders within the overall $24.5 billion credit facility of which the
$1.25 billion letter of credit subfacility is a part.  Plaintiffs assert that they and the other letter of
credit subfacility lenders have a priority right over the other lenders with respect to a certain
collateral account established for the subfacility.  The other lenders claim that all lenders under
the facility have equal rights to that collateral account and its proceeds.  Plaintiffs have not been
provided the information necessary to calculate with precision the amount to which their priority
attaches, but that amount is potentially in the range of several hundreds of millions of dollars.[1]

## GENERAL BACKGROUND

2.      Texas Competitive Electric Holdings Company LLC ("TCEH" or the
"Borrower"), one of the debtors in the above-captioned chapter 11 cases (the "Debtors"), is the
borrower under the $24.5 billion credit facility at issue.

3.      Plaintiffs and other lenders under the letter of credit subfacility (the "Deposit L/C
Loan Facility" and  the "Deposit L/C Loan Facility Lenders"), or their predecessor lenders,
advanced all of the $1.25 billion in cash used to fund the Deposit L/C Loan Facility.  At the
outset of the Deposit L/C Loan Facility, all of that $1.25 billion in cash was placed in a

---

[1]      According to TCEH's public filings, TCEH had $656 million and $556 million in outstanding deposit
letters of credit issued under the letter of credit subfacility as of the end of the quarter immediately before, and the
end of the quarter immediately after, its bankruptcy filing, respectively.  Energy Future Holdings Corp., Quarterly
Report (Form 10-Q) (May 7, 2014); Energy Future Holdings Corp., Quarterly Report (Form 10-Q) (Aug. 1, 2014).
Its corresponding restricted cash as of those dates was $660 million and $582 million, respectively.  Id.  According
to the Debtors' Schedules and Statement of Financial Affairs, TCEH had approximately $660 in such restricted cash
as of the Petition Date (defined below).  Schedules and Statement of Financial Affairs (June 30, 2014) [Case No. 14-
10979, D.I. 1294].

segregated collateral account for the Deposit L/C Loan Facility specifically ("Deposit L/C Loan Collateral Account").

4.        The contractual rules for distribution of the $1.25 billion out of the Deposit L/C Loan Collateral Account align with the source of those funds when deposited into the account. The applicable "waterfall" provisions in the credit documents provide that the same Deposit L/C Loan Facility Lenders who funded the Deposit L/C Loan Collateral Account, and their successor lenders, have a priority right to get a portion of that cash and its proceeds back. Under that "waterfall," those Deposit L/C Loan Facility Lenders are entitled to payment from the proceeds of the Deposit L/C Loan Collateral Account after the letters of credit issued through the Deposit L/C Loan Facility have been paid and related obligations reimbursed, but before the cash in the account and its proceeds are made available to other lenders who had no part in funding the Deposit L/C Loan Facility (the "non-Deposit L/C Loan Facility Lenders").

5.        Marathon has asserted these priority contractual rights in communications with non-Deposit L/C Loan Facility Lenders and the credit facility agent on numerous occasions starting more than six months before the commencement of these chapter 11 cases on April 29, 2014 (the "Petition Date"). The non-Deposit L/C Loan Facility Lenders dispute Plaintiffs' priority contractual rights and have refused to honor them.

6.        At the outset of the Debtors' chapter 11 cases, the rights of Plaintiffs and the other Deposit L/C Loan Facility Lenders were reserved in the cash collateral and DIP financing orders entered by this Court, which reserved rights have not been adjudicated.

7.        In May 2015, Marathon commenced a declaratory judgment action to address these rights in New York state court (the "New York Action"). By stipulation approved by this Court, Marathon agreed to seek that declaratory judgment in this Court, subject to the applicable

plan of reorganization for TCEH and its affiliated debtors expressly preserving the right to do so.[2]

8.      At this point in time, distributions from TCEH under the Credit Agreement (defined below) through a chapter 11 plan of reorganization appear to be imminent. And while Marathon has agreed not to interrupt those distributions being made, Plaintiffs' right to collect any over-distributions from its co-lenders has been reserved.[3] Absent timely adjudication of these issues, Plaintiffs' priority rights are at risk and are likely to be infringed when their co-lenders receive and retain over-distributions on account of their Credit Agreement claims. To resolve the parties' dispute expeditiously and finally, and to protect Plaintiffs' bargained-for rights from infringement by the non-Deposit L/C Loan Facility Lenders, Plaintiffs seek a declaration that they, as Deposit L/C Loan Facility Lenders, have a priority right in any cash and proceeds attributable to any Undrawn Overage Amount (defined below) arising from the Deposit L/C Loan Collateral Account.

## JURISDICTION AND VENUE

9.      This is an adversary proceeding brought pursuant to Federal Rule of Bankruptcy Procedure 7001.

---

[2]      While the New York Action was pending, the Debtors filed a proposed plan of reorganization that purported to override the New York Action. Marathon objected to that version of the Plan (the "Marathon Plan Objection"). To resolve the Marathon Plan Objection, Marathon and the Intervenor Defendants entered into the *Stipulation and Consent Order Regarding Limited Objection of Marathon Asset Management, LP to Confirmation of Debtors' Fifth Amended Plan of Reorganization*, which was approved by this Court on November 10, 2015 [Case No. 14-10979, D.I. 6932] (the "Stipulation and Consent Order"). Pursuant to the Stipulation and Consent Order, the Plan was filed containing amendments that preserve the ability to pursue the claims at issue in this action. In exchange, Marathon agreed to withdraw the Marathon Plan Objection and to dismiss the New York Action, and Marathon further agreed that the claims asserted in this action would be heard by this Court through this adversary proceeding to the extent this Court accepts jurisdiction.

[3]      Plaintiffs further reserve the right to amend this complaint or commence any supplemental proceeding to enforce any declaratory judgment against their co-lenders, including by seeking collection of over-distributions from such co-lenders.

10.    This Complaint is filed pursuant to 28 U.S.C. § 2201(a) to resolve an actual and ripe controversy between the parties concerning their respective contractual rights. This Court has subject matter jurisdiction over the claims raised in this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

11.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## APPLICABLE LAW

12.    Section 13.12 of the Credit Agreement (defined below) at issue here expressly provides that it shall be governed by, and construed in accordance with, the laws of the State of New York.  Section 9.10 of the Intercreditor Agreement (defined below) also at issue here expressly provides for the same governing law.

## PARTIES

13.    Plaintiff Marathon is a limited partnership duly organized and existing under the laws of the State of Delaware and having its principal corporate office at One Bryant Park, 38th Floor, New York, NY  10036.

14.    Plaintiff Polygon Convertible Opportunity Master Fund is a duly organized and existing Cayman Islands exempted company with a registered office at P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands.

15.    Plaintiff Polygon Distressed Opportunities Master Fund is a duly organized and existing Cayman Islands exempted company with a registered office at P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands.

16.    Defendant Wilmington Trust, N.A. ("Wilmington"), upon information and belief, is a national banking association located in the State of Delaware.  Wilmington, solely in its

capacity as Collateral Agent[4] and as Administrative Agent[5] under the Credit Agreement and the

Intercreditor Agreement, as applicable, is named only as a nominal defendant in this Complaint.

For the avoidance of doubt, Plaintiffs do not seek in this action any monetary recovery from, or

to compel or prevent any action by, Wilmington.

17.    Defendant Angelo Gordon & Co., LP is a non-Deposit L/C Loan Facility Lender

that, on information and belief, holds approximately $964,834,359 in claims under the first lien

credit facility. *Verified Statement of O'Melveny & Meyers LLP, Ross Aronstam & Moritz LLP,*

*and the Deposit L/C Intervenors Pursuant to Bankruptcy Rule 2019* [Case No. 14-10979, D.I.

6868]. Defendant Angelo Gordon & Co., LP was one of the Intervenor Defendants in the New

York Action.

18.    Defendant Apollo Advisors VII, L.P. is a non-Deposit L/C Loan Facility Lender

that, on information and belief, holds approximately $2,760,801,611 in claims under the first lien

credit facility. *Id.* Defendant Apollo Advisors VII, L.P. was one of the Intervenor Defendants in

the New York Action.

19.    Defendant Brookfield Asset Management Private Institutional Capital Adviser

(Canada), L.P. is a non-Deposit L/C Loan Facility Lender that, on information and belief, holds

approximately $1,926,829,293 in claims under the first lien credit facility. *Id.* Defendant

Brookfield Asset Management Private Institutional Capital Adviser (Canada), L.P. was one of

the Intervenor Defendants in the New York Action.

20.    Defendants John Doe #1 through John Doe #10 are the other non-Deposit L/C

Loan Facility Lenders. On information and belief, Defendant Wilmington knows the identity of

---

[4]    Wilmington succeeded Citibank, N.A. as Collateral Agent, effective May 1, 2014.

[5]    Wilmington succeeded Citibank, N.A. as Administrative Agent, effective May 1, 2014.

these defendants, and Plaintiffs reserve the right to amend the Complaint with the identities of those defendants if and when they are disclosed to Plaintiffs.

## FACTUAL ALLEGATIONS

### A.    General Background

21.    The rights of the parties to the credit facilities are governed by, and this action will require the interpretation of, primarily two documents:

- First, the Credit Agreement dated as of October 10, 2007, by and among TCEH, Energy Future Competitive Holdings Company ("EFCH"), and the Administrative Agent, Collateral Agent, Deposit Letter of Credit Issuer, and certain Lenders (as such terms are defined therein) who are parties thereto, among others (as amended from time to time and including all related documents, schedules, and agreements the "Credit Agreement"). The Credit Agreement contains provisions for loans made and repaid, and letters of credit issued, under the credit facilities at issue.

- Second, the Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of October 10, 2007, and as amended and restated as of August 7, 2009 (the "Intercreditor Agreement"). The Intercreditor Agreement contains provisions for allocating value among the lenders under the credit facilities at issue, and specifically as between the Deposit L/C Loan Facility Lenders and other lenders (including the non-Deposit L/C Loan Facility Lenders).

22.    At the outset of the Credit Agreement transactions, the $1.25 billion in cash constituting the Deposit L/C Loan Facility was advanced by the Deposit L/C Loan Facility Lenders, including Plaintiffs' predecessors in interest. All of that $1.25 billion was deposited

into a segregated collateral account established by the Borrower as security for the Deposit L/C Loan Facility, the Deposit L/C Loan Collateral Account, such that the account initially contained that $1.25 billion in cash. TCEH has consistently reported in its public filings that this cash is restricted and supports the Deposit L/C Loan Facility.

23.    Under the Credit Agreement and a related security agreement, the Borrower granted a security interest in the Deposit L/C Loan Collateral Account and its cash and proceeds to all of the Deposit L/C Loan Facility Lenders and all of the other lenders and agent parties to the Credit Agreement, including the non-Deposit L/C Loan Facility Lenders (the "Secured Parties") to secure the Borrower's obligations to the Secured Parties. At the same time, Plaintiffs and the other Deposit L/C Loan Facility Lenders were granted a priority right in the Deposit L/C Loan Collateral Account, above the rights of the lenders who made other types of loans under the Credit Agreement but who did not make loans under the Deposit L/C Loan Facility and whose cash was not used to fund any of the $1.25 billion in the Deposit L/C Loan Collateral Account (the non-Deposit L/C Loan Facility Lenders).

24.    In furtherance of Plaintiffs' priority rights, the Secured Parties agreed among themselves and with the Borrower in the Intercreditor Agreement that the funds in the Deposit L/C Loan Collateral Account and proceeds thereof would be distributed essentially as follows:

- *first*, to satisfy all obligations to the issuer of the Deposit Letters of Credit (the "Deposit Letter of Credit Issuer") in respect of the Deposit L/C Loan Facility;

- ***next*, to satisfy obligations to the Deposit L/C Loan Facility Lenders like Plaintiffs under the Deposit L/C Loan Facility**; and

- *finally,* to all of the Secured Parties (whether Deposit L/C Loan Facility

Lenders like Plaintiffs or not) ratably for the remaining obligations under the

Credit Agreement.

This priority "waterfall" guarantees Plaintiffs and the other Deposit L/C Loan Facility Lenders

not just a lien on the Deposit L/C Loan Collateral Account and its cash and proceeds, but a

priority right to specific cash in and proceeds of that account. The Secured Parties that are *not*

Deposit L/C Loan Facility Lenders do not share in that priority right—they only share in that

cash and proceeds if and to the extent the final level of the waterfall is reached.

26. Despite this delineation of rights, certain other Secured Parties, in particular non-

Deposit L/C Loan Facility Lenders (including the named defendants in this action), have shown

an inflexible opposition to Plaintiffs' rights, and will not recognize those rights. The agent under

the Credit Agreement has no economic stake of its own in this issue, but is caught between

dueling positions of the lenders for whom it serves as agent.

26. Accordingly, Plaintiffs bring this action to determine their priority rights in the

Deposit L/C Loan Collateral Account and proceeds thereof, so that, following such

determination, it may collect from the non-Deposit L/C Loan Facility Lenders any amounts paid

to them in excess of the amounts to which they are contractually entitled. Without a declaration

affirming Plaintiffs' rights, such rights will be violated if and when the non-Deposit L/C Loan

Facility Lenders receive and retain distributions from TCEH that are over and above their fair

contractual share.

A.    **The $24.5 Billion Credit Facility**

      ***The Credit Agreement***

27. On or about October 27, 2007, the Borrower entered into the Credit Agreement

with the other parties thereto. A copy of the Credit Agreement (together with its amendments to

date) is attached as Exhibit A hereto.

28.     Under the Credit Agreement, the lenders party thereto (the "Lenders")
collectively provided three separate credit facilities to the Borrower: (i) $20.55 billion in term
loans, (ii) a $2.7 billion revolving line of credit, and (iii) the $1.25 billion Deposit L/C Loan
Facility (the three facilities are referred to collectively as the "Loans"). Each of the Loans was
funded by different (though overlapping) subgroups of the Lenders that committed to participate
in one or more of the Loans. *See* Ex. A, Credit Agreement § 2.

29.     Lenders funded their individual "commitment amount" for the particular Loan or
Loans in which they participated, as specified in the Credit Agreement, and the proceeds of the
different Loans were deployed for distinct purposes. *See* Ex. A, Credit Agreement § 2.

30.     While the Credit Agreement is a "master agreement" that governs all of the Loans
and provides the Lenders with certain collective rights applicable to all Loans, each Loan is a
separate and independent obligation of the Borrower. For example: (1) the Borrower issued
separate promissory notes for each Loan; (2) each Loan has an individual maturity date under the
Credit Agreement, *see* Ex. A, Credit Agreement § 2.5; (3) each Loan had the possibility of
accruing interest at a different rate, *see* Ex. A, Credit Agreement § 2.6, 2.8; and (4) the Borrower
could designate that any voluntary prepayments would apply to a particular Loan or Loans, *see*
Ex. A, Credit Agreement § 5.1.

### *The Deposit L/C Loan Facility and Deposit Letters of Credit*

31.     The Deposit L/C Loan Facility permitted the Borrower to obtain letters of credit
(as defined in the Credit Agreement, the "Deposit Letters of Credit") for general corporate
purposes, including in connection with environmental matters and commodity hedging
agreements, as to which the Borrower would have contingent liabilities but not necessarily any
present (or perhaps any future) obligation to make payment. As stated in the Credit Agreement,
in relevant part:

> Subject to and upon the terms and conditions herein set forth, each Lender having a Deposit L/C Loan Commitment severally, but not jointly, agrees to make a loan or loans (each, a "**Deposit L/C Loan**" and, collectively, the "**Deposit L/C Loans**") in Dollars on the Closing Date to the Borrower, which Deposit L/C Loans (i) shall not exceed, for any such Lender, the Deposit L/C Loan Commitment of such Lender, (ii) shall not exceed, in the aggregate, the Total Deposit L/C Loan Commitment . . . .

Ex. A, Credit Agreement § 2.1(b).

32.     On the closing date under the Credit Agreement, the proceeds of the Deposit L/C Loan Facility advanced by the Deposit L/C Loan Facility Lenders, including Plaintiffs' predecessors in interest, were deposited in the segregated Deposit L/C Loan Collateral Account. As stated in the Credit Agreement, in relevant part:

> On the Closing Date, the Borrower shall establish the Deposit L/C Loan Collateral Account for the purpose of cash collateralizing the Borrower's obligations to the Deposit Letter of Credit Issuer in respect of the Deposit Letters of Credit. On the Closing Date, the proceeds of the Deposit L/C Loans, together with other funds (if any) provided by the Borrower, shall be deposited into the Deposit L/C Loan Collateral Account such that, and the Borrower agrees that at all times thereafter, and shall immediately cause additional funds to be deposited and held in the Deposit L/C Loan Collateral Account from time to time in order that, the Deposit L/C Loan Collateral Account Balance shall at least equal the Deposit Letters of Credit Outstanding.

Credit Agreement § 3.9.

33.     In return, the Borrower granted a security interest in, and a priority right of payment to, the Deposit L/C Loan Collateral Account (and its cash and proceeds) to secure the Borrower's obligations under the Credit Agreement and related documents.  As stated in the Credit Agreement, in relevant part:

> The Borrower hereby grants to the Collateral Agent, for the benefit of the Deposit Letter of Credit Issuer, a security interest in the Deposit L/C Loan Collateral Account and all cash and balances therein and all proceeds of the foregoing, as security for the Deposit L/C Obligations (**and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations; provided that amounts on deposit in the Deposit L/C Loan Collateral Account shall be applied, first, to repay the Deposit L/C Obligations and, then, all other Obligations**).

Credit Agreement § 3.9 (emphasis added).

34.     The security interest in the Deposit L/C Loan Collateral Account was also granted, in a duplicative manner for additional clarity, pursuant to the Security Agreement executed contemporaneously with the Credit Agreement (as amended from time to time and including all related documents, schedules, and agreements, the "Security Agreement," a copy of which is attached as Exhibit B hereto). The Deposit L/C Loan Facility Lenders' security interest in the Collateral (as defined in the Security Agreement) applies to the Deposit L/C Loan Collateral Account and its cash and proceeds. *See* Ex. B, Security Agreement § 2(a)(xii).

### *Deposit Letter of Credit Mechanics*

35.     The mechanics for the funding, issuance, and drawing upon the Deposit Letters of Credit under the Credit Agreement were structured to protect the Deposit Letter of Credit Issuer and the Deposit L/C Loan Facility Lenders independently from the other Secured Parties (including the non-Deposit L/C Loan Facility Lenders) not involved in the Deposit L/C Loan Facility.

36.     Upon the initial closing of the Credit Agreement, the Deposit L/C Loan Facility Lenders, including Plaintiffs' predecessors in interest, funded the $1.25 billion Deposit L/C Loan Facility amount into the Deposit L/C Loan Collateral Account, establishing the maximum amount of Deposit Letters of Credit that could be issued by the Deposit Letter of Credit Issuer at the request of the Borrower. The Borrower then requested that the Deposit Letter of Credit Issuer issue Deposit Letters of Credit to third parties to whom the Borrower or its subsidiaries owed or might owe obligations (the "Letter of Credit Beneficiaries"), effectively to ensure such Letter of Credit Beneficiaries would be paid for those obligations up to the amounts of the applicable Deposit Letters of Credit.

37.    On information and belief, the Deposit Letter of Credit Issuer granted the

Borrower's requests, and issued, in the aggregate, hundreds of millions of dollars in Deposit

Letters of Credit that remained outstanding as of the Petition Date.  For Letter of Credit

Beneficiaries to recover amounts owing to them by the Borrower or its subsidiaries, the Letter of

Credit Beneficiaries would present their applicable Deposit Letters of Credit to the Deposit

Letter of Credit Issuer for payment.

38.    Then, the Deposit Letter of Credit Issuer would pay the Letter of Credit

Beneficiaries the amounts of the applicable draws, and seek reimbursement from the Borrower

for those amounts.  If the Borrower did not reimburse the Deposit Letter of Credit Issuer, the

Deposit Letter of Credit Issuer had the first right to withdraw the unpaid reimbursement amount

from the Deposit L/C Loan Collateral Account and reimburse itself.

### *Deposit Letter of Credit Priority Funds: The Undrawn Overage Amount*

39.    The amount of Deposit Letters of Credit issued was required to be, and on

information and belief was, at all times less than the amount in the Deposit L/C Loan Collateral

Account.  Moreover, not all Letter of Credit Beneficiaries would necessarily be owed by the

Borrower or its subsidiaries the full amount of the applicable Deposit Letters of Credit.  For

these reasons, there were, and remain, two categories of excess amounts in, or otherwise

attributable to, the Deposit L/C Loan Collateral Account.  These two categories of excess

amounts are over and above the maximum amount that would be required to reimburse the

Deposit Letter of Credit Issuer for all amounts owed to it in respect of all Deposit Letters of

Credit.

40.    First, on information and belief, there has been a positive difference between (i)

the amount in the Deposit L/C Loan Collateral Account and (ii) the amount of issued Deposit

Letters of Credit[6]—an amount that never corresponded to any issued Deposit Letter of Credit (the "Unissued Overage Amount"). Plaintiffs have not been provided the information required to calculate this difference with specificity, but for illustration, if a maximum of only $1.0 billion in Deposit Letters of Credit were ever issued, there would exist an Unissued Overage Amount equal to $250 million in the $1.25 billion Deposit L/C Loan Collateral Account.

41.     Second, on information and belief, there has been a positive difference between (i) the amount of issued Deposit Letters of Credit and (ii) the amount that the Letter of Credit Beneficiaries are ultimately owed by the Borrower and its subsidiaries corresponding to those Deposit Letters of Credit (the "Undrawn Overage Amount").

42.     An Undrawn Overage Amount arises in one of three ways (again, the numeric examples here are for illustration, because Plaintiffs have not been provided the information necessary for precise calculations):

- First, an Undrawn Overage Amount arises if a Letter of Credit Beneficiary *does not draw on its applicable Deposit Letter of Credit at all*, because it turns out that the contingent obligations of the Borrower or its subsidiaries never materialize. For example, if a $50 million Deposit Letter of Credit is issued to a beneficiary to secure up to $50 million in obligations of TCEH to the beneficiary, but no portion of that $50 million ever becomes actually owing by TCEH to the beneficiary, then there would exist an Undrawn Overage Amount equal to $50 million.

- Second, an Undrawn Overage Amount arises if a Letter of Credit Beneficiary *draws less than the full amount of its applicable Deposit Letter*

---

[6]     This amount would be augmented by fees and other incidental amounts owing to the Deposit Letter of Credit Issuer.

*of Credit*, because it knows at the time of the draw that the Borrower or its applicable subsidiaries owe, or will owe, the Letter of Credit Beneficiary less than the full amount of the Deposit Letter of Credit. For example, if a $50 million Deposit Letter of Credit is issued to a beneficiary to secure up to $50 million in obligations of TCEH to the beneficiary, and only $20 million of that $50 million ever becomes actually owing by TCEH to the beneficiary, causing the beneficiary to draw only $20 million on the Deposit Letter of Credit, then there would exist an Undrawn Overage Amount equal to $30 million.

- Third, an Undrawn Overage Amount arises if a Letter of Credit Beneficiary *draws the full amount of its applicable Deposit Letter of Credit*, because it does not know at the time of the draw if the Borrower or its applicable subsidiaries owe the Letter of Credit Beneficiary less or more than the full amount of its Deposit Letter of Credit, where the Letter of Credit Beneficiary later determines it was overpaid as a result of the full drawing. In this third scenario, the Letter of Credit Beneficiary *is required to refund to the Borrower any amount in excess of what it was ultimately owed*. For example, if a $50 million Deposit Letter of Credit is issued to a beneficiary to secure up to $50 million in obligations of TCEH to the beneficiary, the beneficiary may have the right to draw that full $50 million upon certain events. But, if only $20 million of that $50 million ever becomes actually owing by TCEH to the beneficiary, the beneficiary would be obligated to return $30 million to TCEH, and then there would exist an Undrawn

Overage Amount equal to $30 million.

43.     In this declaratory judgment action, Plaintiffs seek the preservation and enforcement of their priority secured claim to any Undrawn Overage Amount, however it arises. Plaintiffs do not claim any priority rights in any Unissued Overage Amount.

44.     Despite requests by Marathon for information from TCEH, Plaintiffs are unable to determine with any certainty the actual Undrawn Overage Amount.  However, on information and belief, as ascertained from public filings of TCEH and its affiliates, such an amount existed on the Petition Date (and such an amount still exists), in the range of $500 to $600 million dollars or more.[7]

### *Application of Any Undrawn Overage Amount*

45.     To define the respective rights of the Secured Parties to the Collateral, including the Deposit L/C Loan Collateral Account, the Collateral Agent and Lenders entered into the Intercreditor Agreement.  A copy of the Intercreditor Agreement is attached as <u>Exhibit C</u> hereto. The Intercreditor Agreement divides the Collateral into two categories for the purpose of establishing priorities among the Secured Parties:  (1) the Deposit L/C Loan Collateral Account, and (2) all other Collateral.  *See* Ex. C, Intercreditor Agreement §§ 4.1(a), (b).

46.     Section 4.1 of the Intercreditor Agreement establishes specific priority mechanisms or "waterfalls" for the distribution of proceeds from each of these two categories of Collateral.  *Id.*  Effectively, cash and other proceeds of the Deposit L/C Loan Collateral Account first flows down the waterfall specific to that Collateral only (the "<u>Deposit L/C Loan Collateral Waterfall</u>").

---

[7]     *See supra* Note 1; Energy Future Holdings Corp., Quarterly Report (Form 10-Q) (Nov. 3, 2015) (disclosing that restricted cash relating to the Deposit L/C Loan Facility equaled $506 million as of September 30, 2015).

47.    The Deposit L/C Loan Collateral Waterfall provides that proceeds of the Deposit

L/C Loan Collateral Account are to be distributed as follows:

> first, on a pro rata basis, to the payment of all amounts due to the
> Deposit Letter of Credit Issuer under any of the Financing
> Documents, excluding amounts payable in connection with any
> unreimbursed amount under any Letter of Credit;
>
> second, on a pro rata basis, to the payment of all amounts due to
> the Deposit Letter of Credit Issuer in an amount equal to 100% of
> the Unpaid Drawings under any Deposit Letter of Credit;
>
> third, on a pro rata basis, to any Secured Party which has
> theretofore advanced or paid any fees to the Deposit Letter of
> Credit Issuer, other than any amounts covered by priority second,
> an amount equal to the amount thereof so advanced or paid by such
> Secured Party and for which such Secured Party has not been
> previously reimbursed;
>
> **fourth, on a pro rata basis, to the payment of all other Deposit
> L/C Obligations**; and
>
> last, the balance, if any, after all of the Deposit L/C Obligations
> have been indefeasibly paid in full in cash, as set forth above in
> [the section addressing all Collateral other than Deposit L/C
> Collateral].

Ex. C, Intercreditor Agreement Section 4.1(b) (underlined emphasis in original; bold emphasis

added).

48.    The "first" clause of this waterfall provides that "all amounts due to the Deposit

Letter of Credit Issuer under any of the Financing Documents" other than "amounts payable in

connection with any unreimbursed amount under any Letter of Credit" have the highest priority.

In other words, putting aside "amounts payable in connection with any unreimbursed amount

under any Letter of Credit," the Deposit Letter of Credit Issuer is paid in full through the "first"

clause.

49.    The "second" clause picks up where the "first" clause leaves off.  It provides the

next highest priority to "Unpaid Drawings" amounts for which the Deposit Letter of Credit

Issuer must be reimbursed. Together, the "first" and "second" clauses cover the entire universe of amounts owing to the Deposit Letter of Credit Issuer.

50.     The "third" clause is highly specialized. It says that if a Secured Party advanced funds through the Deposit Letter of Credit Issuer for the issuance of a letter of credit, then, because it was effectively acting under the Deposit Letter of Credit Issuer's priority rights, it should be repaid those funds just after the Deposit Letter of Credit Issuer itself is paid.[8]

51.     That leaves the "fourth" and "last" clauses of this waterfall. These clauses clearly provide for two distinct additional levels of priority. The "fourth" clause allocates value to satisfaction of the Deposit L/C Obligations specifically, before value is allocated to obligations under the Credit Agreement more generally in the "last" clause. Under the "fourth" clause, after the Deposit Letter of Credit Issuer (and Secured Parties acting through to issue letters of credit, if any) has been reimbursed for Unpaid Drawings and all other amounts owing to it as set forth in the first three clauses of that section, proceeds of the Deposit L/C Loan Collateral Account—including the Undrawn Overage Amount, if any—are applied "on a pro rata basis, to the payment of all other Deposit L/C Obligations."[9]

52.     The term "Deposit L/C Obligations" is defined in the Credit Agreement to include the amount of "all outstanding Deposit Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all Deposit Letters of Credit . . . ." Effectively, this means the total amount corresponding to all issued Deposit Letters of Credit, whether undrawn or drawn and not yet reimbursed, and whether owing on account of the Borrower's obligations to the Deposit

---

[8]     Plaintiffs are not aware that any Secured Party acted in this manner. Thus, the "third" clause does not likely have any practical applicability here.

[9]     Pursuant to the "last" clause, excess cash and other proceeds of the Deposit L/C Loan Collateral Account after application of the Deposit L/C Loan Collateral Waterfall, if any, plus any other Collateral and proceeds thereof, then flows down the waterfall generally applicable to all Collateral and proceeds thereof (the "General Collateral Waterfall"), as provided in Section 4.1(a) of the Intercreditor Agreement.

Letter of Credit Issuer or otherwise owing on account of the Deposit L/C Loan Facility.  Ex. A,

Credit Agreement § 1.1 at 23 (emphasis in original).

53.     In sum, all reimbursements and other amounts owing to the Deposit Letter of

Credit Issuer (and any Secured Parties acting through it to issue letters of credit) are to be

distributed to the Deposit Letter of Credit Issuer under the first three clauses of the Deposit L/C

Loan Collateral Waterfall.  After those obligations are paid, the next dollars must be distributed

to pay any other Deposit L/C Obligations.  "Deposit L/C Obligations" means obligations in

respect of issued Deposit Letters of Credit, including the specific amounts advanced by the

Deposit L/C Loan Facility Lenders and segregated to fund those Deposit Letters of Credit.  The

only Deposit L/C Obligations remaining unpaid by the time that the "fourth" clause of the

Deposit L/C Loan Collateral Waterfall becomes operative would be obligations owing to the

Deposit L/C Loan Facility Lenders on account of the Deposit L/C Loan Facility.  Accordingly,

any Undrawn Overage Amount must be paid to the Deposit L/C Loan Facility Lenders pursuant

to that "fourth" clause.[10]

54.     This result is unsurprising and makes good sense.  The Deposit L/C Loan

Collateral Waterfall accords priority to those most closely related to the Deposit Letters of Credit

and the Deposit L/C Loan Facility: the Deposit Letter of Credit Issuer and the Deposit L/C Loan

Facility Lenders who funded that subfacility specifically.  The Intercreditor Agreement specifies

that amounts in the Deposit L/C Loan Collateral Account must be applied first to repay the

Deposit Letter of Credit Issuer for the sum of all amounts that have been drawn by Letter of

---

[10]     Even after payment of all amounts owing to the Deposit Letter of Credit Issuer under the first three clauses of the Deposit L/C Loan Collateral Waterfall, and even after payment of any **Undrawn** Overage Amount to the Deposit L/C Loan Facility Lenders under the "fourth" clause, any **Unissued** Overage Amount would, pursuant to the fifth and "last" clause of the Deposit L/C Loan Collateral Waterfall, ultimately flow into the General Collateral Waterfall for distribution to all Lenders ratably.  *See* Intercreditor Agreement § 4.1(a).  This makes sense, because an amount not tied to any issued Deposit Letter of Credit should not be within the definition of Deposit L/C Obligations.

Credit Beneficiaries, and for which the Deposit Letter of Credit Issuer has not yet been reimbursed by the Borrower (as defined in the Credit Agreement, the "Unpaid Drawings"), plus certain other fees and incidental amounts owing to the Deposit Letter of Credit Issuer under the relevant financing documents. *See* Ex. C, Intercreditor Agreement § 4.1(b), *first*, *second*. Then, the Deposit L/C Loan Facility Lenders are paid. Last, all lenders are paid any excess.

55. This result is also consistent with the repayment provisions of the Credit Agreement. Those provisions provide that if the Borrower, at its election, pays back amounts outstanding under the Deposit L/C Loan Facility, it may withdraw funds from the Deposit L/C Loan Collateral Account in order to complete the repayment. *See* Ex. A, Credit Agreement § 5.2(d). Only after the repayment of all amounts outstanding under the Deposit L/C Loan Facility and the expiration of all Deposit Letters of Credit is the Borrower is entitled to any funds remaining in the Deposit L/C Loan Collateral Account. *See* Ex. A, Credit Agreement § 3.9 That is, upon voluntary repayment by the Borrower, the money used to fund the Deposit L/C Loan Collateral Account must go directly to the lenders that funded the account—the Deposit L/C Loan Facility Lenders—before it is made available to the Borrower (or accessible by non-Deposit L/C Loan Facility Lenders). Likewise, those same funds go to those same lenders, in the same priority, under the Deposit L/C Loan Collateral Waterfall.

56. To reiterate with a more complete example, assume $1 billion in Deposit Letters of Credit were issued under the Deposit L/C Loan Facility, leaving a $250 million Unissued Overage Amount.[11] If the entire $1 billion in Deposit Letters of Credit was drawn and retained by the applicable Letter of Credit Beneficiaries from the Deposit Letter of Credit Issuer, then the

---

[11] The amounts used herein are by way of example only and do not necessarily reflect the actual amounts of issued, drawn, or refunded Deposit Letters of Credit. Such information is not readily ascertainable from publicly-available documents, and Plaintiffs intend to seek such information, including in connection with any discovery in this action or any action to enforce any declaratory judgment against its co-lenders.

Deposit Letter of Credit Issuer would be entitled to be reimbursed that full $1 billion on a first-priority basis from the Deposit L/C Loan Collateral Account, and there would be no Undrawn Overage Amount. If, on the other hand, only $800 million of the $1 billion were drawn by the applicable Letter of Credit Beneficiaries from the Deposit Letter of Credit Issuer on their Deposit Letters of Credit, then, after first-priority payments to the Deposit Letter of Credit Issuer, there would remain an Undrawn Overage Amount of approximately $200 million (less any fees and other incidental amounts owing to the Deposit Letter of Credit Issuer).[12] In this example, there would exist no priority right to the $250 million Unissued Overage Amount.

### CAUSE OF ACTION

### Declaratory Judgment

57.     Plaintiffs repeat and incorporate by reference each and every allegation set forth above as though fully set forth herein.

58.     The Credit Agreement and the Intercreditor Agreement, and the ancillary agreements related thereto, are valid and binding contracts entered into by the parties thereto for good and valuable consideration. Plaintiffs are parties to the Credit Agreement as Deposit L/C Loan Facility Lenders (and as Lenders) and to the Intercreditor Agreement as Secured Parties. Plaintiffs have performed all of their obligations under both the Credit Agreement and the Intercreditor Agreement.

59.     Pursuant to Section 3.9 of the Credit Agreement and the Security Agreement, the Borrower in return for access to Deposit Letters of Credit, granted Plaintiffs, through Wilmington as Collateral Agent, a security interest in the Deposit L/C Loan Collateral Account

---

[12]     Or, if the entire $1 billion were drawn, the Deposit Letter of Credit Issuer would be reimbursed in the amount of $1 billion, and if certain Letter of Credit Beneficiaries later refunded $300 million of the drawn amounts to the Borrower, there would remain an Undrawn Overage Amount of approximately $300 million (again, less any fees and other incidental amounts owing to the Deposit Letter of Credit Issuer).

(and its cash and proceeds) to secure the Borrower's obligations under the Credit Agreement and related documents. That security interest secures Plaintiffs' priority right to any Undrawn Overage Amount, however it may arise.

60.    Pursuant to Section 4.1(b) of the Intercreditor Agreement, the Deposit L/C Loan Collateral Waterfall provides that, after satisfaction of the first three parts of that waterfall, cash and other proceeds of the Deposit L/C Loan Collateral Account, including any Undrawn Overage Amount, must next be distributed to the Deposit L/C Loan Facility Lenders (in accordance with their respective priority under the Deposit L/C Loan Collateral Waterfall). After all of the debts of the Deposit Letter of Credit Issuer and the Deposit L/C Loan Facility Lenders, including payment to the Deposit L/C Loan Facility Lenders of any Undrawn Overage Amount, have been satisfied, and only then, would all other Lenders have a right to repayment under the General Collateral Waterfall. Plaintiffs maintain the right to share ratably in any distributions to non-Deposit L/C Loan Facility Lenders under the General Collateral Waterfall.

61.    The non-Deposit L/C Loan Facility Lenders have not recognized Plaintiffs' priority rights to any Undrawn Overage Amount as Deposit L/C Loan Facility Lenders. In the foreseeable future, those other lenders are likely to receive and retain over-distributions on account of their Credit Agreement claims. Thus, a "justiciable controversy" exists concerning those rights.

62.    Accordingly, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, Plaintiffs request a declaratory judgment that they, as Deposit L/C Loan Facility Lenders, have a priority right in any cash and proceeds attributable to any Undrawn Overage Amount arising from the Deposit L/C Loan Collateral Account, however it may arise, superior to the rights of the non-Deposit L/C Loan Facility Lenders.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, respectfully request the entry of judgment against the defendants as follows:

      A.      Declaring that Plaintiffs, as Deposit L/C Loan Facility Lenders, have a priority right in any cash and proceeds attributable to any Undrawn Overage Amount arising from the Deposit L/C Loan Collateral Account, however it may arise, superior to the rights of the non-Deposit L/C Loan Facility Lenders;

      B.      Directing the non-Deposit L/C Loan Facility Lenders to take all steps necessary to comply with the Court's declaratory judgment;

      C.      Awarding costs; and

      D.      Awarding such other relief available under the law that may be considered appropriate under the circumstances.

Dated: December 10, 2015
   Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Tel: (302) 467-4400
Fax: (302) 467-4450
landis@lrclaw.com
mcguire@lrclaw.com

-and-

**WILMER CUTLER PICKERING HALE AND DORR LLP**

George W. Shuster, Jr.
David Lesser
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: 212-230-8800
Fax: 212-230-8888
george.shuster@wilmerhale.com
david.lesser@wilmerhale.com

Benjamin W. Loveland
60 State Street
Boston, Massachusetts 02109
Tel: 617-526-6000
Fax: 617-526-5000
benjamin.loveland@wilmerhale.com

_Attorneys for Plaintiffs Marathon Asset Management, LP, Polygon Convertible Opportunity Master Fund, and Polygon Distressed Opportunities Master Fund_