IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| MARATHON ASSET MANAGEMENT, | ) | |
| LP, POLYGON CONVERTIBLE | ) | |
| OPPORTUNITY MASTER FUND, and | ) | |
| POLYGON DISTRESSED | ) | |
| OPPORTUNITIES MASTER FUND, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No: 15-51917 (CSS) |
| | ) | |
| WILMINGTON TRUST, N.A., as First | ) | |
| Collateral Agent and First Lien | ) | |
| Administrative Agent; ANGELO | ) | |
| GORDON & CO., LP, APOLLO | ) | |
| ADVISORS VII, L.P., and BROOKFIELD | ) | |
| ASSET MANAGEMENT PRIVATE | ) | |
| INSTITUTIONAL CAPITAL ADVISOR | ) | |
| (CANADA), L.P.; and JOHN DOE #1 | ) | |
| Through JOHN DOE #10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPINION[1]**

Dated: April 12, 2016

Sontchi, J. _____

## INTRODUCTION[2]

There are two distinct lender groups of TCEH First Lien Creditors at issue: (i) a sub-set of lenders that contributed to the Deposit L/C Loan Collateral Account and (ii) first lien lenders that did not. The Plaintiffs, lenders who did participate in the Deposit L/C Loan Collateral Account loan, brought this action seeking declaratory judgment that the Deposit L/C Loan Facility Lenders have priority in the Deposit L/C Loan Collateral Account. The Defendants, lenders who did not contribute funds into this specific account, moved to dismiss the Complaint, arguing that neither the Intercreditor Agreement nor the Credit Agreement, among other documents, provide the priority that the Plaintiffs are seeking. The Court will grant the motion to dismiss as the relevant documents are not ambiguous and do not provide for the priority that the Plaintiffs are seeking.

## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. §§ 1408 and 1409, and continues to be so in the context of this adversary proceeding. This is a core proceeding pursuant to 11 U.S.C. § 157(b).

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

## BACKGROUND

### A.    General Background Related to Bankruptcy Case

On April 29, 2014 (the "Petition Date"), Texas Competitive Electric Holdings ("TCEH" or the "Borrower") and its parent, Energy Future Competitive Holdings ("EFCH," collectively with TCEH and its debtor subsidiaries, the "TCEH Debtors"), along with certain affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

### B.    Procedural History of Adversary Action

In May 2015, one of the plaintiffs, Marathon Asset Management, L.P. ("Marathon"), commenced an action in New York state court seeking declaratory judgment against the Collateral Agent that Marathon has priority interest in the Deposit L/C Collateral (the "New York Action"). The Lender Defendants intervened in that action and removed the action to the United States District Court for the Southern District of New York (the "SDNY Court"). After removal, Marathon filed a motion to remand the action to state court and the Lender Defendants filed a motion to transfer venue of the proceeding to this Court. The SDNY Court had not ruled on either of those motions prior to Marathon's voluntary dismissal of the New York Action, per the agreement discussed *infra*.

On September 21, 2015, the Debtors filed the Fifth Amended Plan.[3] Marathon objected to the Fifth Amended Plan to the extent it purported to dismiss the New York

---

[3] D.I. 6122.

Action without Marathon's consent.  To resolve that objection, Marathon and the Lender Defendants entered into the Stipulation and Consent Order that this Court approved on November 10, 2015, under which: (a) the Fifth Amended Plan was modified to preserve the parties' respective claims and defenses regarding the Deposit L/C Collateral dispute; and (b) Marathon agreed to withdraw its objection to the Fifth Amended Plan, dismiss the New York Action, and litigate the claims asserted in the New York Action in this Court.

On December 9, 2015, this Court entered the amended Confirmation Order confirming the Sixth Amended Plan, which reflected the changes to the Fifth Amended Plan required by the Stipulation and Consent Order.[4]  The Sixth Amended Plan provides for *pro rata* distributions of cash, common stock of Reorganized TCEH and other property to holders of claims under the Credit Agreement based on the amount of their Claims thereunder as of the Petition Date (subject to establishing a reserve for the amounts at stake in the *Delaware Trust* Action).[5]  The distributions to be made under the Sixth Amended Plan do not reflect Plaintiff's (alleged) priority interest in the Deposit L/C Collateral, nor does the Sixth Amended Plan require any distributions to be withheld

---

[4] D.I. 7285.

[5] *See* Sixth Amended Plan, § III.B.28.  After the briefing on this matter was completed, the Court issued an opinion in *Delaware Trust Co. v. Wilmington Trust N.A. (In re Energy Future Holdings Corp.)*, No. 14-10979 (CSS), 2016 WL 944608 (Bankr. D. Del. Mar. 11, 2016), *appeal docketed*, No. 16-189 (D. Del. Mar. 28, 2016) (hereinafter the "*Delaware Trust* Action").  Delaware Trust Company ("DTC") has appealed the Court's decision and this Court subsequently entered a temporary stay pending appeal in the *Delaware Trust* Action (Adv. Pro. No. 15-51239, Adv. D.I. 97 and 104), pending a further hearing currently scheduled for April 29, 2016.

pending resolution of this dispute.[6]  As of the date hereof, the Sixth Amended Plan has not become effective; thus, no distributions have occurred.

On December 10, 2015, Plaintiffs commenced this action by filing the complaint (the "Complaint").  Plaintiffs seek a judgment "declaring that Plaintiffs, as Deposit L/C Loan Facility Lenders, have a priority right in any cash proceeds attributable to any Undrawn Overage Amount arising from the Deposit L/C Loan Collateral Account, however it may arise, superior to the rights of the non-Deposit L/C Loan Facility Lenders," and granting related relief against the non-Deposit L/C Loan Facility Lenders, including the Lender Defendants.

Plaintiffs named Wilmington Trust, N.A. ("Wilmington Trust"), in its capacity as Collateral Agent and Administrative Agent, as a nominal defendant to the action, but do

---

[6]  The Sixth Amended Plan makes the following reservation:

> the TCEH First Lien Creditor Deposit L/C Collateral Allocation Dispute, or claims or Causes of Action asserted in the Marathon Delaware Action (in accordance with and as that term is defined in the Stipulation and Consent Order Regarding Limited Objection of Marathon Asset Management, LP to Confirmation of Debtors' Fifth Amended Plan of Reorganization, dated November 10, 2015 [Docket No. 6932]) by any Holder of Allowed Class C3 Claims against one or more Holders of Allowed Class C3 Claims (other than the TCEH First Lien Agent, except in the TCEH First Lien Agent's capacity as a nominal defendant to declaratory judgment claims in respect of which no monetary recovery is sought) solely with respect to the TCEH First Lien Creditor Deposit L/C Collateral Allocation Dispute.  Notwithstanding anything to the contrary in the Plan, the Plan shall not enjoin or otherwise prevent Holders of EFIH First Lien Note Claims, Holders of EFIH Second Lien Note Claims, the EFIH First Lien Notes Trustee, or the EFIH Second Lien Notes Trustee from prosecuting any appeal of any order with respect to any Makewhole Claims or any other Claims held by such parties.

Sixth Amended Plan, Art. VIII.F(v)(b).

not seek any monetary recovery from, nor to compel nor prevent any action by, Wilmington Trust.

The Lender Defendants filed a motion to dismiss the Complaint (the "Motion"). The Motion is fully briefed and is ripe for the Court's consideration. The Court held oral argument on April 6, 2016. At the conclusion of the argument, the Court took the Motion under advisement. This is the Court's decision thereon.

## C.    Factual Background Related to Adversary Action[7]

### i.    The Parties

The plaintiffs are Marathon, Polygon Convertible Opportunity Master Funds, and Polygon Distressed Opportunities Master Fund (collectively, the "Plaintiffs").

Defendant Wilmington Trust, in its capacity as first-lien Collateral Agent and first-lien Administrative Agent, was named only as a nominal defendant in the Complaint. The other defendants are Angelo Gordon & Co., LP, Apollo Advisors VII, L.P., Brookfield Asset Management Private Institutional Capital Adviser (Canada), L.O.; and John Doe #1 through John Doe #10 (collectively, the "Defendants"), which hold claims under the TCEH first lien credit facility but are "non-Deposit L/C Loan Facility Lenders."

### ii.    Relevant Agreements

There are three relevant agreements in this adversary action: (i) the Credit Agreement dated as of October 10, 2007, by and among TCEH, EFCH, and the

---

[7] As the Court is reviewing a motion to dismiss, the facts set forth herein are from the Complaint and for the purposes of this opinion, the facts as set forth in the Complaint have been accepted as "true." *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

Administrative Agent, Collateral Agent, Deposit Letter of Credit Issuer, and certain Lenders (as amended, the "Credit Agreement"), (ii) the Amended and Restated Collateral Agent and Intercreditor Agreement, dated as of October 10, 2007 (as amended and restated, the "Intercreditor Agreement") and (iii) the Amended and Restated Security Agreement dated as of October 10, 2007 (the "Security Agreement").

### a.  The Credit Agreement

The Credit Agreement is comprised of three credit facilities: (a) a $20.55 billion term loan facility; (b) a $2.7 billion revolving credit facility; and (c) the $1.25 billion Deposit L/C Loan Facility (as defined *infra*) (the three facilities are referred to collectively as the "Loans").  Each of the Loans was funded by different (though overlapping) subgroups of the Lenders that committed to participate in one or more of the Loans.[8]

Plaintiffs and other lenders under the letter of credit subfacility (the "Deposit L/C Loan Facility" and the "Deposit L/C Loan Facility Lenders"), or their predecessor lenders, advanced *all* of the $1.25 billion in cash used to fund the Deposit L/C Loan Facility.  At the outset of the Deposit L/C Loan Facility, all of that $1.25 billion in cash was placed in a segregated collateral account for the Deposit L/C Loan Facility specifically (the "Deposit L/C Loan Collateral Account").  TCEH represents in its public filings that cash in the Deposit L/C Loan Collateral Account is restricted.

---

[8] *See* Credit Agreement, § 2.

Under the Credit Agreement and the Security Agreement, the Borrower granted a security interest in the Deposit L/C Loan Collateral Account and its cash and proceeds to all of the Deposit L/C Loan Facility Lenders and all of the other lenders and agent parties to the Credit Agreement, including the non-Deposit L/C Loan Facility Lenders (collectively, the "Secured Parties") to secure the Borrower's obligations to the Secured Parties.

The Plaintiffs brought this action to determine their priority rights in the Deposit L/C Loan Collateral Account and proceeds thereof.

### 1. The Deposit L/C Loan Facility and Deposit Letters of Credit

The Deposit L/C Loan Facility permitted the Borrower to obtain letters of credit (as defined in the Credit Agreement, the "Deposit Letters of Credit") for general corporate purposes. As stated in the Credit Agreement, in relevant part:

> Subject to and upon the terms and conditions herein set forth, each Lender having a Deposit L/C Commitment severally, but not jointly, agreed to make a loan or loans (each, a "Deposit L/C Loan" and, collectively, the "Deposit L/C Loans") in Dollars on the Closing Date to the Borrower, which Deposit L/C Loans (i) shall not exceed, for any such Lender, the Deposit L/C Loan Commitment of such Lender, (ii) shall not exceed, in the aggregate, the Total Deposit L/C Commitment . . . [9]

On the closing date under the Credit Agreement, the proceeds of the Deposit L/C Loan Facility advanced by the Deposit L/C Loan Facility Lenders, including Plaintiffs'

---

[9] Credit Agreement, § 2.1(b) (emphasis in original removed) (capitalized terms defined herein shall be used as defined *infra*).

predecessors in interest, were deposited in the segregated Deposit L/C Loan Collateral

Account.  As stated in the Credit Agreement, in relevant part:

> On the Closing Date, the Borrower shall establish the Deposit L/C Loan Collateral Account for the purpose of cash collateralizing the Borrower's obligations to the Deposit Letter of Credit Issuer in respect of the Deposit Letters of Credit.  On the Closing Date, the proceeds of the Deposit L/C Loans, together with other funds (if any) provided by the Borrower, shall be deposited into the Deposit L/C Loan Collateral Account such that, and the Borrowers agrees that at all times thereafter, and shall immediately cause additional funds to be deposited and held in the Deposit L/C Loan Collateral Account from time to time in order that, the Deposit L/C Loan Collateral Account Balance shall at least equal the Deposit Letters of Credit Outstanding.[10]

In return, the Borrower granted a security interest in, and a priority right of

payment to, the Deposit L/C Loan Collateral Account (and its cash and proceeds) to

secure the Borrower's obligations under the Credit Agreement and related documents.

As stated in the Credit Agreement, in relevant part:

> The Borrowers hereby grants to the Collateral Agent, for the benefit of the Deposit Letter of Credit Issuer, a security interest in the Deposit L/C Loan Collateral Account and all cash and balances therein and all proceeds of the foregoing, as security for the Deposit L/C Obligations (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations; provided that amounts on deposit in the Deposit L/C Loan Collateral Account shall be applied, first, to repay the Deposit L/C Obligations and, then, all other Obligations).[11]

---

[10] Credit Agreement, § 3.9.

[11] Credit Agreement, § 3.9.  The Security Agreement also notes the security interest in the Deposit L/C Loan Collateral Account.  *See* Security Agreement, § 2(a)(xii).

## 2.   Deposit Letter of Credit Mechanics

Upon the initial closing of the Credit Agreement, the Deposit L/C Loan Facility Lenders, including Plaintiff's predecessors in interest, funded the $1.25 billion Deposit L/C Loan Facility amount into the Deposit L/C Loan Collateral Account, establishing the maximum amount of Deposit Letters of Credit that could be issued by the "Deposit Letter of Credit Issuer(s)" at the request of the Borrower.  The Borrower then requested that the Deposit Letter of Credit Issuers issue Deposit Letters of Credit to third parties to whom the Borrower or its subsidiaries owed or might owe obligations (the "Letter of Credit Beneficiaries").  In order to recover amounts owing to them by the Borrower, the Letter of Credit Beneficiaries could present their applicable Deposit Letters of Credit to the Deposit Letter of Credit Issuers for payment, if and when necessary.  The Deposit Letter of Credit Issuers would pay the Letter of Credit Beneficiaries the amount of the applicable draws, and seek reimbursement from the Borrower for those amounts.  If the Borrower did not reimburse the Deposit Letter of Credit Issuer, the Deposit Letter of Credit Issuer had the first right to withdraw the unpaid reimbursement amount from the Deposit L/C Loan Collateral Account and reimburse itself.

## 3.   Deposit Letter of Credit Priority Funds:  The Undrawn Overage Amount

The amount of the Deposit Letters of Credit issued was required to be less than the amount in the Deposit L/C Loan Collateral Account.  Furthermore, not all Letter of Credit Beneficiaries would necessarily be owed by the Borrower or its subsidiaries the

full amount of the applicable Deposit Letters of Credit. Thus, there were, and remain, two categories of excess amounts in, or otherwise attributable to, the Deposit L/C Loan Collateral Account. These two categories of excess amounts are over and above the maximum amount that would be required to reimburse the Deposit Letter of Credit Issuers for all amounts owed to them in respect of all Deposit Letters of Credit.

First, there has been a positive difference between (i) the amount in the Deposit L/C Loan Collateral Account and (ii) the amount of issued Deposit Letters of Credit. This excess amount has never corresponded to any issued Deposit Letter of Credit (the "Unissued Overage Amount"). In short, the Borrower has never requested the issuance of Deposit Letters of Credit in the fully authorized amount of $1.25 billion.

Second, there has been a positive difference between (i) the amount of issued Deposit Letters of Credit and (ii) the amount that the Letter of Credit Beneficiaries are ultimately owed by the Borrower and its subsidiaries corresponding to those Deposit Letters of Credit (the "Undrawn Overage Amount"). The Undrawn Overage Amount arises in three ways: (i) if the Letter of Credit Beneficiary does not draw on its applicable Deposit Letter of Credit at all; (ii) if the Letter of Credit Beneficiary draws less than the full amount of its applicable Deposit Letter of Credit; and (iii) if Letter of Credit Beneficiary draws the full Deposit Letter of Credit but later determines that it was overpaid thereby requiring the Letter of Credit Beneficiary to refund the Borrower any amount in excess of what it is ultimately owed. At the time of the Petition Date, the

11

Plaintiffs assert that there was approximately $500 to $600 million or more of Undrawn Overage Amount in the Deposit L/C Loan Collateral Account.  In the Complaint, the Plaintiffs are only seeking priority in the Undrawn Overage Amount.

### b.  The Intercreditor Agreement

The Collateral Agent and the Lenders entered into the Intercreditor Agreement to define the respective rights of the Secured Parties to the Collateral, including the Deposit L/C Loan Collateral Account.  The Intercreditor Agreement divides the Collateral into two categories for the purpose of establishing priorities among the Secured Parties: (i) the Deposit L/C Loan Collateral Account, and (ii) all other Collateral.[12]

Section 4.1 of the Intercreditor Agreement establishes specific priority mechanisms (i.e. "Waterfall") for the distribution of proceeds from each of these two categories of Collateral.  The Deposit L/C Loan Collateral Waterfall provides that proceeds of the Deposit L/C Loan Collateral Account are to be distributed as follows:

> Regardless of any Insolvency or Liquidation Proceeding which has been commenced by or against the Borrower or any other Loan Party, Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies under the Security Documents by the Collateral Agent shall be applied in the following order (it being agreed that the Collateral Agent shall apply such amounts in the following order as promptly as is reasonably practicable after the receipt thereof; <u>provided</u> that such amounts shall not be so applied until such time as the amount of the Secured Obligations have been determined in accordance with the terms hereof and

---

[12] Intercreditor Agreement, §§ 4.1(a) and (b).

under the terms of the relevant Financing Document, including and subject to Sections 4.3 and 4.4 below)

. . .

> first, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer under any of the Financing Documents, excluding amounts payable in connection with any unreimbursed amount under any Letter of Credit;
>
> second, on a pro rata basis, to the payment of all amounts due to the Deposit letter of Credit Issuer in an amount equal to 100% of the Unpaid Drawings under any Deposit Letter of Credit;
>
> third, on a pro rata basis, to any Secured Party, which has theretofore advanced or paid any fees to the Deposit Letter of Credit Issuer, other than any amounts covered by priority second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;
>
> fourth, on a pro rata basis, to the payment of all other Deposit L/C Obligations; and
>
> last, the balance, if any, after all of the Deposit L/C Obligations have been indefeasibly paid in full in cash, as set forth in Section 4.1(a).[13]

The Credit Agreement defined "Deposit L/C Obligations" to mean:

> As at any date of determination, the aggregate Stated Amount of all outstanding Deposit Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all Deposit Letters of Credit. For all purposes of this Agreement, if on

---

[13] Intercreditor Agreement, § 4.1(b) (underlining provided in original).

> any date of determination a Deposit Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Deposit letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.[14]

The Plaintiffs assert that all reimbursement and other amounts owing to the Deposit Letter of Credit Issuers are to be distributed to the Deposit Letter of Credit Issuers under the first three clauses of the Waterfall.  More specifically, Plaintiffs assert that the Deposit L/C Loan Collateral Account must be applied first to repay the Deposit Letter of Credit Issuers for the sum of all amounts that have been drawn by Letter of Credit Beneficiaries, and for which the Deposit Letter of Credit Issuers have not yet been reimbursed by the Borrower (as defined in the Credit Agreement, the "Unpaid Drawings"), plus certain other fees and incidental amounts owing to the Deposit Letter of Credit Issuers under the relevant financing documents.

Thereafter, the next dollars must be distributed to pay any other Deposit L/C Obligations.  The Plaintiffs continue that the only Deposit L/C Obligations remaining unpaid by the time that the "fourth" clause of the Waterfall becomes operative would be obligations owing to the Deposit L/C Loan Facility Lenders on account of the Deposit L/C Loan Facility – thus, any Undrawn Overage Amount must be paid to the Deposit L/C Loan Facility Lenders pursuant to that "fourth" clause.

---

[14] Credit Agreement, § 1.1 "Deposit L/C Obligations."

The Plaintiffs further assert that this interpretation is consistent with the repayment provisions of the Credit Agreement.  The Credit Agreement provides that if the Borrower, at its election, pays back amounts outstanding under the Deposit L/C Loan Facility, it may withdraw funds from the Deposit L/C Loan Collateral Account in order to complete the repayment.[15]  Only after the repayment of all amount outstanding under the Deposit L/C Loan Facility and the expiration of all Deposit Letters of Credit is the Borrower entitled to any funds remaining in the Deposit L/C Loan Collateral Account.[16]  Thus, upon voluntary repayment by the Borrower, the money used to fund the Deposit L/C Loan Collateral Account must go directly to the lenders that funded the account – the Deposit L/C Loan Facility Lenders.

In their Complaint, the Plaintiffs seek declaratory judgment that they, as Deposit L/C Loan Facility Lenders, have a priority right in any cash and proceeds attributable to any Undrawn Overage Amount arising from the Deposit L/C Loan Collateral Account, superior to the rights of the non-Deposit L/C Loan Facility Lenders.

### c.  Security Agreement

Pursuant to the Security Agreement executed contemporaneously with the Credit Agreement, a security interest in the Deposit L/C Loan Collateral Account was also granted.  The Secured Parties' security interest in the Collateral (as defined in the Security

---

[15]  Credit Agreement, § 5.2(d).

[16]  Credit Agreement, § 3.9.

Agreement) applies to the Deposit L/C Loan Collateral Account and its cash and proceeds.[17]

## DISCUSSION

### A.    Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[18]  At this stage in the proceeding, it is not the question of "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[19] Since the *Twombly* and *Iqbal* decisions, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading."[20]  This new standard requires "a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[21]  It is insufficient to provide "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."[22]  Under the heightened standard, a complaint "must contain either direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[23]  The Court, in

---

[17] Security Agreement, § 2(a)(xii).

[18] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

[19]  *Scheuer v. Rhodes*, 416 U.S. 232, 236, abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 134 (Bankr. D. Del. 2005).

[20] *Fowler*, *supra*, 578 F.3d at 210.

[21] *Id*.

[22] *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).

[23] *Twombly*, 550 U.S. at 562.

order to determine whether a claim meets this requirement, must "draw on its judicial experience and common sense."[24]  In *Fowler*, the Third Circuit articulated a two-part analysis to be applied in evaluating a complaint.[25]  First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[26]  Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[27]

## B.    Contract Interpretation

Under New York law, which governs the Intercreditor Agreement,[28] the Court need not look "outside the four corners" of a complete document to determine what the parties intended.[29]  Here, neither party has alleged that the Intercreditor Agreement is an incomplete document, so it is not necessary to resort to extrinsic evidence to interpret it. A contract is not ambiguous merely because the parties offer different constructions of the same term.[30]

If the Court reaches the conclusion that the Intercreditor Agreement is unambiguous, the Court then relies on long-recognized canons of interpretation to determine its meaning.  First, "[t]he best evidence of what parties to a written agreement

---

[24] *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 34 (Bankr. D. Del. 2011).

[25] *Fowler*, 578 F.3d at 210-11.

[26] *Id.*

[27] *Id.* at 211.

[28] Intercreditor Agreement, § 9.10.

[29] *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990).

[30] *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

intend is what they say in their writing."[31]  Second, should there be an inconsistency between a specific and general provision of a contract, the specific controls.[32]  Third, "[a] reading of the contract should not render any portion meaningless."[33]

Although, the Court has previously held that the Intercreditor Agreement is not ambiguous;[34]  the Plaintiffs urge that in the context of this dispute it is ambiguous.  The Court disagrees and finds that the Intercreditor Agreement is not ambiguous in the context of this dispute.  Therefore, the Court will not consider extrinsic evidence.

## C.  Summary of Parties' Arguments

The Defendants' move to dismiss based on three arguments:  First, section 4.1(b) of the Intercreditor Agreement does not govern Plan Distributions as it only applies when the Collateral Agent exercises remedies on the Collateral, as such the Waterfall does not apply.  Second, even if the Waterfall were to apply to Plan Distributions, it would not give the Plaintiffs a priority in the Deposit L/C Loan Collateral Account.  The Defendants assert that "Deposit L/C Obligations" are obligations owed exclusively to the Deposit Letter of Credit Issuers on account of Deposit Letters of Credit.  The contractually-defined term "Deposit L/C Objections" does not include obligations owed to the Deposit L/C

---

[31] *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted).

[32] *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985).

[33] *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

[34] *Delaware Trust* Action, 2016 WL 944608, at *9.

Loan Facility Lenders, like Plaintiffs, who extended loans to TCEH under the Credit Agreement.  Those loans are referred to in the Credit Agreement using a separate defined term "Deposit L/C Loans" that (i) is not included in the definition of "Deposit L/C Obligations" and (ii) does not appear in the Waterfall.  Third, the Defendants assert that reading a higher priority into the Waterfall for the Deposit L/C Loan Facility Lenders (like Plaintiffs) would frustrate the Credit Agreement's expressly-stated purpose in creating the Deposit L/C Loan Collateral Account, which is to ensure that TCEH's reimbursement obligations to the Deposit Letter of Credit Issuer are always fully cash-collateralized.  The Defendants assert that the Plaintiffs' position would remove the collateral securing the Deposit Letters of Credit, thereby exposing the Deposit Letter of Credit Issuers.

The Plaintiffs assert that the Deposit L/C Loan Facility Lenders have a priority right to the return of the specific, segregated funds that they, and only they, advanced to TCEH as part of a separate letter of credit subfacility (the "L/C Subfacility") within the larger credit facility.  The Plaintiffs assert that the Waterfall's fourth priority does not expressly state who holds the priority payment right thereunder, making a further inquiry into the Credit Facility documents and transactions necessary.

## D.  Plan Distributions

### i.    Parties' Arguments

The Defendants argue that the Plaintiffs do not allege that there has been an "exercise of remedies" in the Complaint, an essential element of the Waterfall.  The

Defendants continue that *even if* the Plaintiffs had alleged that the Collateral Agent has exercised or will exercise remedies, the Intercreditor Agreement would still not provide the relief Plaintiffs seek for two reasons.   First, the "remedies under the Security Documents" do not include the receipt of distributions under a chapter 11 plan.  Second, the term "exercise" and "Collateral Agent" would be stripped of their meaning if individual lenders' mere receipt of plan distributions in return for extinguishing their allowed claims were to qualify as an "exercise of remedies by the Collateral Agent."  The Defendants asserts that here the Collateral Agent is being passive and not taking any action to release the claims or liens because the liens are being released automatically as a result of the operation of the Sixth Amended Plan.  The Defendants adopt the reasoning of the Intervenors[35] in the *Delaware Trust* Action.

Regardless of the outcome in the *Delaware Trust* Action, the Plaintiffs assert that the matter *sub judice* is distinguishable because here the distributions are tied to a specific collateral account (the Deposit L/C Loan Collateral Account), which is being distributed under a specific Waterfall endorsed in both the Credit Agreement and the Intercreditor Agreement; thus, such Waterfall must govern such distributions.   In addition, the Plaintiffs assert that acceptance (or deemed acceptance) of Collateral by the Collateral Agent is an exercise of remedies.

---

[35]  At the time the parties submitted the briefs in this action, the Court had not yet decided the *Delaware Trust* Action.

ii.    **Analysis**

As the Court held in the *Delaware Trust* Action, under the unambiguous terms of

the Intercreditor Agreement, in order for the Waterfall in section 4.1 to be applicable, four

precedent elements must be satisfied.  These elements are:

> (i) Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors;
>
> (ii) the Collateral must be "received" by the Collateral Agent;
>
> (iii) the Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral; and
>
> (iv) the sale, disposition, or collection must have resulted from the exercise of remedies under the Security Documents.
>
> As Section 4.1 is the only section in the Intercreditor Agreement regarding application and distribution of proceeds, if any of these initial requirements are not met, then the . . . Plan Distributions would be distributed outside of the Intercreditor Agreement (i.e. pursuant to the terms of the Bankruptcy Code, orders of this Court, and the Plan).[36]

The Court held in the *Delaware Trust* Action that none of these precedent elements applied

to the plan distributions at issue.  More specifically, the Court held that: (i) the Plan

Distributions were not Collateral or proceeds of Collateral; (ii) the Plan Distributions

were not received by the Collateral Agent; (iii) the Plan Distributions did not result from

the sale or disposition of the Collateral; and (iv) there has been no exercise of remedies

---

[36] *Delaware Trust* Action, 2016 WL 944608, at *10.

by the Collateral Agent.[37]  The Court adopts the ruling and holding in the *Delaware Trust Action in toto* and incorporates that decision herein, with one caveat.  As the Sixth Amended Plan reserves all rights of the Plaintiffs related to these claims, the Court herein makes no determination regarding whether the Plan Distributions will be "received" by the Collateral Agent.  As all four elements in section 4.1 need to be met, however, the Plaintiffs' claim must fail because they fail to meet the other three precedent elements regardless of the issue of "receipt."

The Plaintiffs argue that the case *sub judice* is distinguishable from the *Delaware Trust* Action because the Plaintiffs are seeking recovery from a specific piece of collateral.  However, there is no reference excluding the required precedent elements governing applicability of section 4.1 because the Plaintiffs are seeking to recover from a "specific" asset.  Thus, the Plaintiffs' asserted distinction fails.

Consistent with the Court's rulings in the *Delaware Trust* Action (with the caveat mentioned *supra*), the Court finds that the Waterfall is inapplicable to the case *sub judice*

---

[37] *Id.* at *10-15.  As to the "exercise of remedies" the Court held:

> The Waterfall in Section 4.1 only applies if there was an "exercise of remedies."  The Court agrees that "simply" holding liens is not an exercise of remedies. Furthermore, in an Event of Default, the Collateral Agent would need to take direction Required Secured Parties in order to satisfy the Secured Obligations, which would be the case with Plan Distributions. As such, all actions taken since the Petition Date (the filing of bankruptcy is an Event of Default) could only be upon the direction of the Required Secured Lenders.

*Id.* at *15.

as three of the four requirements in the section 4.1's precedent elements have not been

met.

**E. Other Provisions of the Intercreditor Agreement and Credit Agreement Do Not Give Priority Rights to the Deposit L/C Loan Facility Lenders.**

      **i.   Parties' Arguments**

Notwithstanding that the precedent elements required for applicability of the

Waterfall in section 4.1 are missing, the parties make a number of arguments as to

whether to the Intercreditor Agreement and Credit Agreement give priority rights to the

Deposit L/C Loan Facility Lenders.  In support of their Motion, the Defendants first argue

that the definitions in the Credit Agreement establish that "Deposit L/C Obligations"

refer exclusively to obligations TCEH owed to the Deposit Letter of Credit Issuers, and

not obligations owing to the Deposit L/C Loan Facility Lenders.  Second, the Defendants

assert that the plain language of Section 4.1(b) makes clear that the fourth priority of the

Waterfall, for Deposit L/C Obligations, covers obligations owed to the Deposit L/C

Issuers only.  The Defendants assert that if the Undrawn Overage Amount was to be

distributed then the Deposit L/C Issuers would be left with insufficient Collateral to

secure the Deposit L/C Obligations relating to undrawn amounts still owed under the

outstanding Deposit Letters of Credit.  Third, the Defendants assert that the express intent

and provisions of the Credit Agreement demonstrate that the Deposit L/C Facility

Lenders do not enjoy a higher priority in the Deposit L/C Collateral.   Fourth, the

Defendants assert that the Plaintiffs rely on provisions of the Credit Agreement that do not create priority rights in the Deposit L/C Collateral.

Plaintiffs' responses will be discussed below.

### ii. Even if the Precedent Elements of Section 4.1 Allowed for Application of the Waterfall the Plain Language of the Intercreditor Agreement Does Not Give the Plaintiffs Priority.

#### a. The Intercreditor Agreement States that the First Lien Lenders Should Have *Pari Passu* Treatment.

As the Defendants point out, the Intercreditor Agreement explicitly states that all First Lien Creditors share *pari passu* with one another without any discussion of segregating the collateral. Section 2.1 of the Intercreditor Agreement states:

> <u>Pari Passu</u>. As among the Secured Parties, all Liens on the Collateral shall rank *pari passu*, no Secured Party shall be entitled to any preferences or priority over any other Secured Party with respect to the Collateral (except as otherwise provided in <u>Section 4.1</u>) and the Secured Parties shall share in the Collateral and All Proceeds thereof in accordance with the terms of this Agreement.[38]

Furthermore, the "Incremental Deposit L/C Loans"[39] rank *pari passu* with the previously issued debt under the Credit Agreement, without specifying any special priority for the Deposit L/C Loans[40] nor the Deposit L/C Loan Collateral Account.[41]

---

[38] Intercreditor Agreement, § 2.1 (underlining in original).

[39] *See* Credit Agreement, §§ 1.1 and 2.14(a).

[40] "Deposit L/C Loans" is defined in section 2.1(b) of the Credit Agreement. *See* p. 8, *supra*.

[41] Credit Agreement, § 2.14(d).

Additionally, the Credit Agreement defines "Deposit L/C Obligations" as the obligations that TCEH owes to the Deposit Letter of Credit Issuers and not obligations owing to the Deposit L/C Loan Facility Lenders.  The terms "Deposit L/C Obligations" includes (a) the Stated Amount[42] of outstanding Deposit Letters of Credit; and (b) Unpaid Drawings.[43]  The Defendants assert that these two components reflect the total potential exposure if the Deposit Letter of Credit Issuers to losses at any given time but are unconnected to the Deposit L/C Loan Facility Lenders' credit risk.

The Plaintiffs respond that, as the only lenders for the Deposit L/C Loan Collateral Account, no other First Lien Lender should be entitled to share in that collateral.  The Plaintiffs continue that "Obligations" includes all amounts owing in respect to all "Loans," including amounts owed to the lenders who advanced those loans.  More specifically, as the Deposit L/C Loan Facility Lenders are the *only* lenders who advanced the Deposit L/C Loan Collateral Account, they should be the only lenders who receive payment from that account.

---

[42] "Stated Amount" is defined to be "any Letter of Credit shall mean the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met."  Credit Agreement, § 1.1 ("Stated Amount").

[43] Section 3.4(a) defines Unpaid Drawing as the following: "The Borrower hereby agrees to reimburse the applicable Letter of Credit Issuer, by making payment in Dollars to the Administrative Agent in immediately available funds, for any payment or disbursements made by such Letter of Credit Issuer under any Letter of Credit (each such amount so paid until reimbursed, an 'Unpaid Drawing') . . . ."  Credit Agreement, § 3.4 (emphasis removed).  *See also* Credit Agreement, § 1.1 ("Unpaid Drawing").

### b. The Fourth Priority in the Waterfall Does Not Create a Priority for the Deposit L/C Loan Facility Lenders.

The Defendants assert that the term "Deposit L/C Loans" does not appear anywhere in the definition of "Deposit L/C Obligations" or in the Waterfall, nor does the term "Deposit L/C Obligations" appear anywhere in the definition of "Deposit L/C Loans." The Defendants assert that if the Plaintiffs had a priority right to the Deposit L/C Obligations then the Deposit L/C Loans would be included within the definition of Deposit L/C Obligations or those terms would somehow be linked. The Defendants also assert that the Waterfall does not provide for the satisfaction of Deposit L/C Obligations owing to the Deposit Letter of Credit Issuers on account of undrawn amounts under the Deposit Letter of Credit because if it did then the Deposit Letter of Credit Issuers would be left with insufficient Collateral to secure the Deposit L/C Obligations relating to the undrawn amounts under the still-outstanding Deposit Letters of Credit.[44]

The Plaintiffs disagree. First, the Plaintiffs assert that the term "Obligations" includes all amounts owing in respect of all "Loans" under those documents, including amounts owed to lenders who advanced those loans.

Second, the Plaintiffs assert that the Defendants conflate the action of the Deposit L/C Loan Facility Lenders (advancing the Deposit L/C Loans) with the liabilities that

---

[44] In other words, the Defendants are asserting that the Plaintiffs' asserted "priority rights" in the Deposit L/C Loan Collateral Account would effectively transfer risk associated with the "Undrawn Overage Amount" from all Secured Parties (both Deposit L/C Loan Facility Lenders and non-Deposit L/C Loan Facility Lenders) to the Deposit Letter of Credit Issuers. The Defendants assert that this would be entirely inconsistent with the purpose of the Deposit L/C Loan Collateral Account, as well as the position of the Deposit Letter of Credit Issuers senior to other Secured Creditors in the Credit Agreement.

TCEH incurred as a result of those lenders' advances, i.e., the Deposit L/C Obligations. The Plaintiffs assert that the "plain meaning" of "loan" and "obligation" should be ascribed, i.e., a loan is something a lender advances to a borrower, and an obligation is something that the borrower must satisfy on account of that loan.

Third, the Plaintiffs assert that the definition of Deposit L/C Obligations itself is essentially a formula:

> Deposit L/C Obligations = undrawn Deposit Letters of Credit
> + drawn Deposit Letters of Credit.

The Plaintiffs assert that this is the equivalent to the amount to the Deposit Letters of Credit supported by the cash collateral advances by the Deposit L/C Loan Facility Lenders when making the Deposit L/C Loans. The Plaintiffs reason that the sum of these two components of the Deposit L/C Obligations definition cannot be equivalent to any amount that is or could be owing to the Deposit Letter of Credit Issuers at any point in time when the fourth priority under the Waterfall is reached. The Plaintiff continues that by the time the fourth level of the Waterfall is relevant, the Deposit Letter of Credit Issuers must have already been paid *all amounts* then owing to it on account of the Deposit L/C Obligations. The Plaintiffs go on to argue that the only possible candidates for the fourth priority are the Deposit L/C Facility Lenders for obligations owing to them on account of the Deposit L/C Loans that they alone made.

Fourth, the first three priorities of the Waterfall are amounts owing to the "Deposit Letter of Credit Issuers" as "payee." The Plaintiffs assert that if the fourth priority was

also for the Deposit Letter of Credit Issuers, then the drafters would have said so.  The Plaintiffs assert that the "silent" payees in the fourth priority are the Deposit L/C Loan Facility Lenders.

Plaintiffs can only claim priority by establishing that "Deposit L/C Obligations" includes the obligation to repay Deposit L/C Loan Facility Lenders for the loans that initially funded by Deposit L/C Loan Collateral Account – but the Plaintiffs do not hold Deposit L/C Obligations and are not owed Deposit L/C Obligations as that term is defined in the Credit Agreement.  First, the Credit Agreement's specific definition of "Deposit L/C Obligations" does not encompass the more general, unspecified "obligations owed to lenders that are not Deposit Letter of Credit Issuers.  The term "Deposit L/C Obligations" is limited to the sum of TCEH's obligations, only on account of all *issued* Deposit Letters of Credit (whether drawn or undrawn).  The amount of "Deposit L/C Obligations" represents the total amount that TCEH could owe at any given time to the Deposit Letter of Credit Issuers on account of outstanding Deposit Letters of Credit (which fluctuated as Deposit Letters of Credit are issued, drawn and terminated, and as drawings are reimbursed).  As the Defendants point out this can be contrasted to the amount of "Obligations"[45] owed to Deposit L/C Loan holders, which

---

[45] "Obligations" is also defined by the Credit Agreement as "all advances to, and debt, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan Posting Advance or Letter or Credit or under any secured Cash Management Agreement, . . . whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party of any proceeding under any bankruptcy or insolvency

reflects principal, interest and fees on the $1.25 billion in loans Plaintiffs and other lenders extended as of the facility's closing (and that must be equal to or exceed the amount of Deposit L/C Obligations at any given time).

As the Defendants assert, once all Deposit Letters of Credit have expired or are otherwise terminated, the Deposit Letter of Credit Issuers have been made whole under the first three priorities of the Waterfall; thus, the Deposit L/C Obligations would no longer exist, as both the Stated Amount of outstanding Deposit Letters of Credit and unreimbursed amounts thereunder would equal zero and the fourth priority would be a null set. Thus, at this point, the **fifth** priority of the Waterfall would apply and any remaining Deposit L/C Collateral would be distributed *pari passu* to all First Lien Creditors through the section 4.1(a) Waterfall like other Collateral.

As defined in the Credit Agreement "Deposit L/C Obligation" is limited to the exposure of the Deposit Letter of Credit Issuers and does not link to the "Obligations" that TCEH owed. Rather than being "meaningless," the fourth priority seeks to be a "catch-all" provision to fully protect the Deposit Letter of Credit Issuers before funds are diverted to the First Lien Lenders per section 4.1(a) of the Credit Agreement.

Although the Plaintiffs are correct that the fourth priority does not name a "payee" as it does in priorities first, second and third – the Court finds that the defined term "Deposit L/C Obligations" is sufficient to indicate the type of obligation that the fourth

---

law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. . . ." Credit Agreement, § 1.1 ("Obligations").

priority is seeking to pay and that is sum of TCEH's obligations under issued Deposit

Letters of Credit, whether drawn or undrawn.  Thus the Court finds that the silent payee

does not create an ambiguity nor does the Court read into the document a priority for the

Deposit L/C Loan Facility Lenders.

Thus, *even if* the initiatory requirements of section 4.1 did not apply or were

satisfied (which they are not), the fourth priority in the Waterfall does not create a priority

for the Deposit L/C Loan Facility Lenders in the Deposit L/C Loan Collateral Account.

### iii.    Express Provisions Do Not Give Priority to the Deposit L/C Loan Facility Lenders

The Defendants urge the Court not to adopt construction of a provision that would

frustrate another explicit provision of the agreement.  The Defendants assert that the

Plaintiffs' interpretation frustrates four express provisions of the documents.[46]

First, the Deposit L/C Loan Collateral Account exists to "collateralize [TCEH]'s

reimbursement obligations to the Deposit Letter of Credit Issuer,"[47] not to collateralize

TCEH's obligations to the Deposit L/C Facility Lenders.  The purpose of the Deposit L/C

Loan Collateral Account is also apparent from other operative provisions of section 3.9

that (a) grant the Collateral Agent a first priority interest in the Deposit L/C Loan

Collateral Account for the benefit of the Deposit Letter of Credit Issuers; (b) grant the

---

[46] *See Beal Sav. Bank*, 865 N.E.2d at 1213-14 ("The court should construe the agreements so as to give full meaning and effect to the material provisions.  A reading of the contract should not render any portion meaningless.  Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." (citations and internal quotation marks omitted)).

[47] Credit Agreement, § 3.9.

Collateral Agent a second priority interest in the Deposit L/C Loan Collateral Account for the benefit of all other Secured Lenders; and (c) require the balance of the Deposit L/C Loan Collateral Account to exceed the amount of Deposit Letters of Credit outstanding at all times.  As the Defendants assert, none of these provisions contemplate Deposit L/C Facility Lenders enjoying a higher priority in that account than other Secured Parties.

Second, when the parties to the Credit Agreement intended for the Deposit L/C Obligations to include obligations owed to both lenders and letter of credit issuers (as opposed to letter of credit issuers alone) they did so.[48]

Third, the import of Section 2.14(d) of the Credit Agreement is that all Secured Parties are *pari passu* with each other, with no priority carve-out for Deposit L/C Loan Facility Lenders.[49]

During argument, Plaintiffs pointed to the following language in section 3.1(e) that states:

> With respect to the Deposit L/C Loan Collateral, references in this Agreement to Required Secured Parties shall be deemed references to the Required Deposit L/C Loan Lenders until

---

[48] *See* Credit Agreement, §§ 1.1, 3.3, 3.8 and 3.9.  *Delaware Trust Co, v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 527 B.R. 178, 192 (Bankr. D. Del. 2015), *aff'd*, No. CV 15-620 RGA, 2016 WL 627343 (D. Del. Feb. 16, 2016) ("The Indenture here was negotiated at arm's length between sophisticated parties who were represented by counsel.  The Court is unwilling to read into agreements between sophisticated parties provisions that are not there. (citations, quotation marks, and internal modifications omitted)).

[49]  The Defendants also assert that the Deposit L/C Loan's primary economic terms are identical to those of the other loans extended under that agreement – if the parties had intended that the Deposit L/C Loan Facility Lenders would get "priority rights" in the Deposit L/C Loan Collateral Account, the Deposit L/C Loans would have had a lower risk profile that would have been reflected in the economic terms of those loans.  However, the Court would need extrinsic evidence to consider this argument.  The Court makes no finding on the economic soundness of the provisions in the Intercreditor Agreement.

> proceeds from the Deposit L/C Loan Collateral have been
> applied pursuant to <u>Section 4.1(b)</u> to satisfaction of all
> priorities except "last".[50]

The Plaintiffs assert that the provision indicates that *only* with the consent of the Deposit

L/C Loan Facility Lenders could the Waterfall in section 4.1(b) (first through fourth

priorities) be amended.  The Plaintiffs assert that if their consent is required to amend

these provisions then they must be beneficiaries under the Waterfall – or in their words:

> That account is full of their money, and if you're going to take
> away their right to get it back, they need to consent.[51]

Although the Court can appreciate this argument's nuance, the Court finds that in no

way does this provision regarding amendments gives the Deposit L/C Loan Facility

Lenders the priority they are looking for.  The Court could conjecture several reasons

why the Deposit L/C Loan Facility Lenders' consent for amendments would be

preferable, however, guesswork is not necessary in determining that the language of the

Intercreditor Agreement does not provide a priority to the Plaintiffs, regardless of any

consent to amendment verbiage.

### iii.    Plaintiffs' asserted provisions

#### a.  Parties' Arguments

Defendants assert that the Plaintiffs rely on two sections of the Credit Agreement,

yet neither helps the Plaintiffs.  First, section 5.2(d) of the Credit Agreement provides that

in cases where the Waterfall is not implicated, TCEH may (but is not required) to repay

---

[50] Intercreditor Agreement, § 3.1(e).

[51] Transcript of Oral Argument at 34:6-8 (Apr. 6, 2016) (D.I. 8169).

such Deposit L/C Loans using funds in the Deposit L/C Loan Collateral Account. However, as the Defendants point out, that provision also makes clear that TCEH may only repay the Deposit L/C Loans with funds in that account if repayment would not cause the account balance to fall below the amount of the Deposit Letters of Credit outstanding.  Thus, section 5.2 states that only funds in the account that can be used to repay the Deposit L/C Loans are amounts not necessary to secure TCEH's obligations under outstanding Deposit Letters of Credit because it expressly prohibits repaying the Deposit L/C Facility Lenders from funds that are necessary to secure outstanding Deposit L/C Obligations.

Second, the last sentence of section 3.9 of the Credit Agreement[52] illustrates that "Deposit L/C Loans" and "Deposit L/C Obligations" have different meanings by using those terms separately in the last clause.  The Defendants assert that section 3.9 does not require TCEH to pay the Deposit L/C Loans or the Deposit L/C Obligations with any particular funds.  Rather, section 3.9 speaks to the Borrower's rights to the Deposit L/C Loan Collateral Account after the Deposit L/C Loan Facility has effectively been terminated and the lenders and issuer under the facility repaid.

_____

[52] Section 3.9 provides:

> In addition, the Collateral Agent hereby agrees to instruct the Depository Bank to release and pay to the Borrower amounts (if any) remaining on deposit in the Deposit L/C Loan Collateral Accounts after the termination or cancellation of all Deposit Letters of Credit and the repayment in full of all outstanding Deposit L/C Loans and Deposit L/C Obligations.

Credit Agreement, § 3.9.

The Plaintiffs assert that under section 5.2(d), TCEH may repay the Deposit L/C Loan Facility Lenders – not the Defendants – with any excess in the Deposit L/C Loan Collateral Account over and above the amounts required to protect the Deposit Letter of Credit Issuers at the time of the voluntary repayment.

The Plaintiffs continue that section 3.9 provides for a specific waterfall as to how amounts in the Deposit L/C Loan Collateral Account must be distributed.  The Plaintiffs assert that because section 3.9 of the Credit Agreement states that the amounts in the Deposit L/C Loan Collateral Account shall be first applied to repay the Deposit L/C Obligations – that is specific waterfall must control over the more general language in section 3.9 regarding the purpose of the section.  The Plaintiffs continue that they should be entitled to look to their specific collateral after the Deposit Letter of Credit Issuers have been paid.

### b.  Analysis

Section 5.2(d) states, in relevant part:

> Upon any prepayment of Deposit L/C Loans, the Deposit Letter of Credit Commitment shall be reduced by an amount equal to such prepayment and the Borrower shall be permitted to withdraw an amount up to the amount of such prepayment from the Deposit L/C Loan Collateral Account to compete such prepayment; <u>provided</u> that after giving effect to such withdrawal, the Deposit Letters of Credit Outstanding at such time would not exceed the Deposit L/C Loan Collateral Account.[53]

---

[53] Credit Agreement, § 5.2(d).

However, this seems (again) to protect the Deposit Letter of Credit Issuers by making

sure that the Deposit Letters of Credit are always fully collateralized.  Plaintiff argue that

section 5.2(d) creates an additional waterfall for voluntary prepayments – however, the

Court does not believe that is the "best" reading of this provision.  The Court interprets

section 5.2(d) as an affirmative statement that even in the case of a voluntary repayment,

the Deposit L/C Loan Collateral Account will never be less than the outstanding Deposit

Letters of Credit.

    Section 3.9 states:

> The Borrower hereby grants to the Collateral Agent, for the
> benefit of the Deposit Letter of Credit Issuer, a security
> interest in the Deposit L/C Loan Collateral Account and . . .
> .[proceeds thereof], as security for the Deposit L/C
> Obligations . . . .[54]

The provision continues that amounts of deposit in such account shall be applied "first,

to repay the Deposit L/C Obligations" before repaying any other "Obligations."  Here,

again, the Plaintiffs conflate the definitions of "Deposit L/C Obligations" (all issued

drawn and undrawn Deposit Letters of Credit) and "Obligations" (amounts TCEH owes

under the Credit Agreement).  Furthermore, the Plaintiffs ignore the clause "for the

benefit of the Deposit Letter of Credit Issuer."  The Court finds that section 3.9 seeks to

protect the Deposit Letter of Credit Issuers for all issued Deposit Letters of Credit

---

[54] Credit Agreement, § 3.9.

(whether drawn or undrawn) and does not create another waterfall giving priority to the Deposit L/C Loan Facility Lenders.

### c. Conclusion

The Court finds that neither section 5.2(d) nor section 3.9 provide for a waterfall of payments giving priority to the Deposit L/C Loan Facility Lenders.

### iv.   Equity Does Not Override the Written Agreements.

Although not referred to as such, it appears that the Plaintiffs assert a purely equitable argument. The Plaintiffs argue that *even if* there is no specific language in the Credit Agreement that the Plaintiffs should have priority as the Deposit L/C Loan Collateral Account was separately funded with their money. The L/C Subfacility has a separate, distinct, and identifiable set of lenders and is a separate, distinct and identifiable fund, in a segregated account. Furthermore, the Plaintiffs are not seeking priority over the Deposit Letter of Credit Issuers – the Plaintiffs are only seeking priority over the other TCEH First Lien Lenders as to any amounts remaining from the Deposit L/C Loan Collateral Account after the Deposit Letter of Credit Issuers are paid in full. The Plaintiffs assert that the Deposit Letter of Credit Issuers have been or will be made whole, and that substantial excess amount from the Deposit L/C Loan Collateral Account are available – the Plaintiffs assert they are entitled to this excess (before the other TCEH First Lien Lenders).

Although the Court appreciate the Plaintiffs' assertions, the Court finds that the terms and provisions of the Credit Agreement and the Intercreditor Agreement dictate the relationship between the parties.[55]   The parties to these documents were highly sophisticated and if they had intended for the Deposit L/C Loan Collateral Account to be paid to the Deposit L/C Loan Facility Lenders then they should have specifically provided for such in the operative documents.

## F.  The Plaintiffs' Request for Leave to Amend

In a footnote, the Plaintiffs requested leave to amend the Complaint in order to supplement their allegations upon any dismissal by the Court.[56]   Federal Rule of Civil Procedure 15(a), made applicable to this proceeding by Fed. R. Bankr. P. 7015, provides that a court should "freely give leave [to amend a pleading] when justice so requires."[57] The decision to grant a motion for leave to amend is within the "sound discretion" of the court.[58]  "Courts have shown a strong liberality . . . in allowing amendments."[59]

---

[55] *See, supra*, note 48.

[56] *Plaintiff's Memorandum of Law in Opposition to Lender Defendants' Motion to Dismiss Complaint*, p. 29 n. 18 (Adv. D.I. 11).

[57] Fed.R.Civ.P. 15(a).

[58] *Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007); *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 518-19 (3d Cir. 1988) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[59] *Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938 (3d Cir. 1984); *see also Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) ("We have held that motions to amend pleadings should be liberally granted."); *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984) ("Fed.R.Civ.P. 15 embodies the liberal pleading philosophy of the federal rules.").

In *Foman v. Davis*, the leading Supreme Court case reflecting this liberal standard,[60] the Supreme Court held:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or a dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be freely given.[61]

"Third Circuit courts have extrapolated five instances in which a court may deny leave to amend a complaint: (1) if delay in seeking amendment is undue; (2) if delay in seeking amendment is prejudicial to the opposing party; (3) if delay in seeking amendment is motivated by bad faith; (4) if the amendment is futile in that it fails to state a claim for which relief can be granted; or (5) if the movant does not provide a drafted amended complaint."[62]

Here, the Court will focus on futility. Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted."[63] "The standard for assessing futility is the 'same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6).'"[64] Here, the Court finds that even if the

---

[60] *Mortgage Lenders Network USA, Inc. v. Wells Fargo Bank (In re Mortgage Lenders Network, USA, Inc.)*, 395 B.R. 871, 876 (Bankr. D. Del. 2008).

[61] 371 U.S. 178, 182 (1962).

[62] *In re Mortgage Lenders Network, USA, Inc.*, 395 B.R. 871, 876 (*citing Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001)).

[63] *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) (citations omitted).

[64] *Id.* at 175 (Citation omitted).

Plaintiffs had asserted additional facts, such factual allegations would be futile in the context of this dispute which is based on contract interpretation.  As such, the Court denies the Plaintiffs request for leave to amend the Complaint.

## CONCLUSION

As set forth above, the Court will grant the Defendants' Motion and dismiss the Complaint in its entirety.  The Court finds that that neither the Intercreditor Agreement nor the Credit Agreement provides the Deposit L/C Loan Facility Lenders with priority in the Deposit L/C Loan Collateral Account.  Furthermore, the Court finds that there are no amendments that could be made to the Complaint to assert such a priority.

An order will be issued.